UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY POWELL,

          Plaintiff,                    Civil Action No. 4:12-11861

      v.                          District Judge Gershwin A. Drain
                                    Magistrate Judge Laurie J. Michelson

PARIS, EWING, FRUIT, SLEEP, FARRAR,
SKEANS, DARGA, BRASSFIELD, ALBRECHT,
UNKNOWN K-9 POLICE OFFICER (DOG),
PLYMOUTH TOWNSHIP, and
WESTLAND TOWNSHIP,

          Defendants.

_____/

**REPORT AND RECOMMENDATION TO (1) DENY ALBRECHT'S MOTION FOR SUMMARY JUDGMENT [25], (2) DENY WESTLAND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [26], AND (3) SUA SPONTE DISMISS DEFENDANTS EWING, FRUIT, SLEEP, FARRAR, SKEANS, DARGA, UNKNOWN K-9 POLICE OFFICER (DOG), PLYMOUTH TOWNSHIP, AND WESTLAND TOWNSHIP**

In this Fourth Amendment excessive force case, Plaintiff Gregory Powell says that, in effectuating his arrest, police officers ordered him to the ground and that he "complied by getting on the ground face down on his stomach and plac[ing] his hands behind his back." (Dkt. 13, Am. Compl. at 5.) He was handcuffed and then, Powell avers, he was repeatedly stomped and punched while one of the officers sicced his patrol dog on him. (*Id.*) The officers provide a very different account of the arrest: they say that Powell failed to heed multiple warnings and fought them to avoid arrest. This might be what in fact happened, but when deciding a summary judgment motion, this Court is not permitted to resolve genuine disputes over material facts by making credibility assessments. For this reason, and those that follow, Defendants' summary judgment motions (Dkts.

25, 26) should be DENIED.[1]

## I.

Although the Court adopts Powell's version of the facts, where Powell is silent, the Court relies on Defendants' account. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Around 4:00 in the morning on December 18, 2011, Westland Police Officer Paris was on routine patrol. (Dkt. 26, Westland Defs.' Mot. Summ. J., Ex. 2, Paris' Rep. at 5.) While driving south on Merriman Road, Paris noticed that the glass front door of the Regal Market had been "shattered" and that it had a "hole" at the bottom. (Paris' Rep. at 5-6.) When Paris stopped in front of the market, he saw an individual, later identified as Powell, dressed in black and crawling out of the broken door. (Paris' Rep. at 6.) Paris immediately notified dispatch and drove toward the door. (*Id.*) Powell, however, ran around the market and through an alley behind the building. (*Id.*) When Paris drove into the alley, he saw Powell running southbound on Lillian Street, a street that parallels Merriman one block to the west. (*Id.*) By the time Paris turned onto Lillian, Powell "was no longer in sight." (*Id.*)

Soon, eight other Westland police officers arrived in the "area." (Paris' Rep. at 6.) In particular, Sergeant Ewing and Officers Fruit, Sleep, Farrar, Skeans, Darga, and Brassfield set up a perimeter around the "area" while Officer Percin "watched the front door to make sure there were no other suspects inside." (*Id.*)

---

[1]One of the two summary judgment motions is titled "Defendant, Officer Steve Albrecht's Motion to Dismiss And/Or in the Alternative, Motion for Summary Judgment." (Dkt. 25, Albrecht's Mot. Summ. J.) But the motion goes beyond testing the sufficiency of the allegations in the Amended Complaint: it relies on Albrecht's police report, Albrecht's affidavit as to the accuracy of that report, and another officer's police report. (Albrecht's Mot. Summ. J., Ex. 1, 1A, 2.) The Court therefore will treat the Albrecht's motion (Dkt. 25) as one for summary judgment.

A short time later, Plymouth Township K-9 Officer Steve Albrecht arrived. (Paris' Rep. at 6.) Albrecht, aided by his certified patrol dog Radar, began tracking Powell. (Paris' Rep. at 6.) They eventually headed southbound on Lillian, with Radar checking the area between the properties at 1625 and 1639 Lillian. (Paris' Rep. at 6.) At that point, Powell "popped" out of some bushes and Officers Brassfield, Albrecht, and Paris observed Powell dart across Lillian Street. (Paris' Rep. at 6; Albrecht's Rep. at 3.) Albrecht yelled to Powell that if he did not stop running, he would release Radar and Powell "would be injured." (Dkt. 25, Albrecht's Mot. Summ. J., Ex. 1, Albrecht's Report at 3.) Powell, however, did not slow until he arrived at a "large wood fence" between 1660 and 1680 Lillian. (Paris' Rep. at 6; *see also* Albrecht's Rep. at 3 (describing the fence as a "six foot privacy fence").)

This is where Powell's account begins and the parties' stories diverge. In his verified Amended Complaint, Powell swears as follows:

> Officers gave chase and caught up to Plaintiff/Suspect Gregory Powell next to a privacy fence. Officer Paris ordered Plaintiff to get on the ground. Plaintiff complied by getting on the ground face down on his stomach and placed his hands behind his back. Plaintiff was handcuffed moments later. Other Officers began to arrive and began to stomp Plaintiff in the head, face, and stomach as well as several punches thrown at Plaintiff. Within a few minutes, an Officer brought a dog up to Plaintiff, caused the dog to attack, pulled the dog off of Plaintiff, then let the dog bite Plaintiff again on the back of his legs, which resulted in three (3) dog bites to the Plaintiff's body.

(Dkt. 13, Am. Compl. at 5.)

Both Albrecht's and Paris' police reports recount the arrest very differently. They provide that Powell attempted to climb the fence but was unsuccessful; Officers Brassfield and Paris then "pulled" (Albrecht's Rep. at 3) or "escorted" (Paris' Rep. at 6) Powell to the ground. Powell then "resisted arrest by clinching his fist under his body. [Powell] was told several times to place his

3

hands behind his back[;] however[,] he continued to resist." (Paris' Rep. at 6.) According to Albrecht's report, the following then occurred:

> The male subject began fighting with one of the Westland officers as he tried to put handcuffs on him. I yelled at the male subject to stop fighting or I was going to put my dog on him and he would be bit. The suspect continued to fight and I gave RADAR his command to bite the subject. Radar grabbed onto the suspect on the right buttock and the suspect continued to fight. I yelled at the suspect to stop resisting and stop fighting with my dog.
>
> The suspect curled his hands under his stomach/chest and still would not comply with orders. I outed RADAR and yelled at the subject to stop resisting or I would re-engage my dog. The male subject continued to fight and I instructed RADAR to bite the subject again. RADAR re-engaged the subject in the right calf area. The suspect continued to kick and fight with Officers. When the suspect began kicking I outed RADAR to prevent him from getting injured and had him target the upper body. RADAR grabbed onto the right elbow of the subject and he continued to fight for a few more seconds. The suspect then advised he would stop fighting and comply with orders. RADAR was outed . . . .

(Albrecht's Rep. at 3.) Powell then placed his hands on top of his head and Brassfield and Paris "were able to place [Powell's] hands behind his back and he was handcuffed . . . . [Powell] was searched by [Officer] Brassfield with no weapons or contraband located." (Paris' Rep. at 6.) When Powell spoke, the officers could "smell a strong odor of intoxicants coming from his breath. His speech was slurred and [they] could not understand anything [Powell] was saying." (Paris' Rep. at 6; *see also* Albrecht's Rep. at 4.)

Meanwhile, Sergeant Ewing and Officer Percin were reviewing the security tapes with the market's owner, who, apparently, had now arrived at the scene. (Paris' Rep. at 6.) Ewing then advised other officers that there was a second suspect; the officers began checking backyards on Lillian and, "a short time later," Officer Farrar found the second suspect hiding behind a garage in a Lillian backyard. (*Id.*) Farrar arrested the suspect without incident. (*Id.*)

Officers Brassfield and Darga transported Powell to the police station. (Paris' Rep. at 7.)

4

Once there, Powell began receiving treatment for the bite marks to his buttocks and the back of his right leg. (*Id.*) Around 6:00 a.m., Powell was transported to the hospital for further treatment. (*Id.*) Powell was treated for a "black eye, blows to the head that caused bruises, a broken left hand, fractured ribs, and three (3) dog bites—one on the elbow, one on the butto[cks], and one on the leg." (Am. Compl. at 5.)

In April 2012, Powell filed this suit against Plymouth Township Officer Albrecht and Plymouth Township ("Plymouth Defendants"). He also named Westland Sergeant Ewing; Westland Officers Fruit, Sleep, Farrar, Skeans, Darga, and Brassfield; and Westland Township, which identifies itself as the City of Westland ("Westland Defendants"). Powell alleges that in arresting him in December 2011, Defendants used excessive force and/or "failed to protect [him] from egregious harm inflicted by other police officers" and thereby violated rights secured by the Fourth, Eighth, and Fourteenth Amendments to the Constitution. (Am. Compl. at 5-7.)

Defendants not only disagree but believe that, on the present record, no reasonable jury could agree with Powell. They therefore move for summary judgment. (Dkt. 25, Albrecht's Mot. Summ. J.; Dkt. 26, Westland Defs.' Mot. Summ. J.)

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the summary judgment motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*

5

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

One major hurdle to Defendants' motions is that when applying the above burden-shifting framework, this Court cannot resolve material fact disputes by making credibility assessments. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."). Instead, this Court must "construe the evidence," and "draw all reasonable inferences" from the evidence, in favor of Powell. *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012); *see also*, *Matsushita*, 475 U.S. at 587. If Powell's version of the facts was "blatantly contradicted" by incontrovertible evidence, such as a police video of the arrest, this Court would not be bound to accept his account. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). But the record does not present that situation. Instead, this is the not uncommon situation of the defendants saying one thing happened, the plaintiff another. *See Smith v. Stoneburner*, — F.3d —, No. 12-1963, 2013 WL 1920874 (6th Cir. May 10, 2013) ("These dueling accounts create a question of fact about whether Charles resisted arrest. If he did resist, the officers' force may well have been reasonable. . . . If not, they likely crossed the line into the forbidden grounds of excessive force. . . ."); *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687-88 (6th Cir. 2006) ("It is true that the evidence of the deputies at this stage appears significantly stronger than that of Shreve. . . . Shreve, however, swore to a version of the facts that does amount to excessive force. . . . It is therefore ultimately up to the jury to believe her or not.").

One other aspect of the governing procedural standard is important here. The typical complaint is not summary judgment evidence. *Hamilton v. Myers*, 281 F.3d 520, 525 (6th Cir. 2002) ("The non-moving party may not rely on his pleadings alone . . . ."). But the same is not true for a

6

*verified* complaint, such as Powell's. (*See* Dkt. 13, Am. Compl. at 7 ("I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.").) "[A] verified complaint . . . carries the same weight as would an affidavit for the purposes of summary judgment." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

### III.

The Plymouth Defendants and the Westland Defendants move for summary judgment on the same two grounds. They both assert that, given Powell's resistence, the officers used "objectively reasonable" force as that term is used in Fourth Amendment jurisprudence. (Dkt. 25, Albrecht's Mot. Summ. J. at 4-7; Westland Defs.' Mot. Summ. J. at 6-9.)[2] Second, Defendants claim that, even if their conduct was objectively unreasonable, they are entitled to qualified immunity because federal law at the time of Powell's arrest did not "clearly establish" that their conduct was objectively unreasonable. (Albrecht's Mot. Summ. J. at 7-10; Westland Defs.' Mot. Summ. J. at 10-13.) The Court considers these two arguments in turn. Through the summary-judgment lens which the Court must view the facts, neither is persuasive.

### A.

To determine whether an officer has violated the Fourth Amendment by using excessive force, courts apply "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham v. Connor*,

---

[2]The Court agrees with Defendants that because the alleged excessive force occurred during an arrest, neither the Eighth Amendment nor the Fourteenth Amendment (other than to incorporate the Fourth Amendment against the states) play a role in this case. *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606 (6th Cir. 2006); *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002).

490 U.S. 386, 395-96 (1989)). Courts must be mindful that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. In determining reasonableness, relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These factors, however, are not exhaustive: ultimately, a court must consider the "totality of the circumstances." *Fox*, 489 F.3d at 236.

The Court begins with Defendants' authorities in support of their claim that they used objectively reasonable force. The Plymouth Defendants rely on two cases involving the use of a police dog to apprehend a suspect: *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988) and *Matthews v. Jones*, 35 F.3d 1046 (6th Cir. 1994). (Albrecht's Mot. Summ. J. at 5-7.) The Westland Defendants add a third case, *Wylie v. Overby*, No. 05-71945, 2006 WL 1007643 (E.D. Mich. Apr. 14, 2006), which involved the reasonable use of a taser. (Westland Defs.' Mot. Summ. J. at 8-9.) Although Defendants do not rely on *Phipps ex rel. Phipps v. Goecker*, No. 11-11706, 2012 WL 2367166 (E.D. Mich. June 21, 2012), it held, relying in part on *Robinette* and *Matthews*, that the use of a police dog to apprehend a suspect was not excessive force. Ultimately, however, none of these cases justify taking Powell's case from the jury. The Court first summarizes each of them and then explains how material facts differ from Powell's account.

In *Robinette*, shortly after midnight, police officers spotted a broken glass door to a car dealership and identified a suspect inside. 854 F.2d at 911. Officer Barnes and his police dog Casey were summoned to the scene. *Id.* Barnes and Casey entered the darkened building and Barnes

8

warned the suspect, hidden inside, that if he did not come out, Casey would be released. *Id.* The

suspect did not heed the warnings and so Barnes released Casey. *Id.* Casey found the suspect first,

and by the time Barnes caught up to his dog, "Casey had the suspect's neck in his mouth. . . . A

substantial amount of blood had collected around him and more was oozing from his neck." *Id.* The

suspect died not long thereafter. *Id.* In finding that Barnes' use of Casey to apprehend the suspect

was reasonable under the circumstances, the Sixth Circuit emphasized that the suspect was hidden

inside a darkened building and refused to surrender: "this is a case where an officer was forced to

explore an enclosed unfamiliar area in which he knew a man was hiding." *Id.* at 913-14.

In *Matthews*, the Sixth Circuit relied on *Robinette* to again find that the bite of a police dog

to apprehend a suspect was not excessive force. 35 F.3d at 1050-52. Matthews, after leading the

police on a car chase, pulled over and darted into the woods. *Id.* at 1048. Officer Watkins, and his

canine, Roscoe, arrived on scene to track Matthews. *Id.* Eventually, Roscoe "stopped at the edge of

a swampy, heavily wooded area and reacted as if the suspect were nearby." *Id.* Watkins then

repeatedly warned that if Matthews did not surrender, Roscoe would be released. *Id.* Matthews

refused and Roscoe discovered Matthews "lying on his stomach in the weeds, his hands underneath

his body." *Id.* Then,

> Watkins ordered Matthews not to move and informed him that if he remained still
> the dog would be recalled. Instead of complying with Officer Watkins's order,
> Matthews quickly rose to his knees; Roscoe reacted to the sudden movement by
> biting Matthews on the arm and holding him there. Matthews struggled with the dog,
> causing Roscoe to reposition his bite. At that point, Watkins ordered Roscoe to
> release Matthews and took Matthews into custody.

*Id.* In finding that Roscoe's bite did not amount to excessive force, the Sixth Circuit noted that

Matthews fled into a "densely wooded area," "in the darkness," and this "provided a strategic

advantage to Matthews in that he could easily ambush the officers." *Id.* at 1051. Further, the record

9

was clear that Matthews, with his hands "concealed beneath his body," was ordered not to move but then "chose to move." *Id.*

*Wylie* did not involve a police dog but a taser. Police officers were interviewing the plaintiff, Wylie, for theft. 2006 WL 1007643, at *1-2. One of the officers, Overby, told Wylie not to light a cigarette while he was inside the police vehicle. *Id.* at *2. Overby then left to interview someone else at the scene and, when he returned, he found Wylie smoking. *Id.* Overby instructed Wylie to put out the cigarette; Wylie took one more puff and then tossed the cigarette to the ground. *Id.* At this point, "Overby . . . reached inside the vehicle and grabbed [Wylie] by his shirt, whereupon Plaintiff 'slid past' Defendant Overby, trying to break free from his grasp in order to leave the area and avoid being taken to jail." *Id.* Wylie recalled that, while Overby was still holding his shirt, he continued to take "three or four steps before he decided to stop." *Id.* "When [Wylie] stopped, he turned toward . . . Overby, and started to raise his hands to shoulder height, with his palms facing out, in what [Wylie] claim[ed] was a position of surrender." *Id.* Overby and another officer thought otherwise, and so they tased Wiley "in the rib cage, right temple, and on the top of his skull." *Id.* In finding that the officers used reasonable force, the district court reasoned that Wylie's claim that the fight had ended and that he had surrendered by raising his hands was "incompatible" with "a rapidly occurring series of acts that did not occur discretely." *Id.* at *8 (emphasis removed). It was "entirely clear" to the court that, "from the perspective of a reasonable objective officer, an assaultive subject trying to escape who suddenly turns and raises his hands to shoulder height could as easily be assuming an aggressive posture in preparation for fighting as trying to indicate a surrender." *Id.* at *8.

10

Although not cited by Defendants, *Phipps* is similar to the cases that they rely on. There, a teenager, Phipps, and his friend broke into an elementary school on a Sunday. 2012 WL 2367166, at *1. The first responding officer, Goecker, pursued the fleeing suspects but could not apprehend them. *Id.* Another officer, Paul, and his dog, Ike, then began to track the two suspects through a foot of mostly new-fallen snow. *Id.* At some point, Phipps decided to lay face down in the snow with his hands underneath him. *Id.* Ike discovered Phipps ahead of his handler. *Id.* According to Phipps, "As [he] continued to lay face down with his hands underneath him, Ike apprehended [him] by grabbing [his] left shoulder with his teeth. After [he] moved his hands to push Ike away, Ike bit [him] in the left ear." *Id.* Phipps further recalled that "neither officer said anything to [him] or Ike before Ike attacked [him]" and that " as he was lying submissively in the snow and saying that he surrendered, Goecker punched [him] at least 3 times in the body and left eye and side of his face." *Id.*

Regarding Phipps' excessive-force claim against Paul, the Court found that Ike's bite was not objectively unreasonable force in view of a number of factors, including that Phipps "was laying face down in the snow with his hands underneath him such that the police officers did not know if Plaintiff was armed," Phipps did not "respond when he knew the officers—and the police dog—were present," and Phipps "did not bring his hands out from underneath his body until he struck the police dog." *Id.* at *9. (As noteworthy is the court's resolution of Phipps' claim against Goecker: "Goecker acknowledges that, as all evidence must be construed in Plaintiff's favor for purposes of a Rule 56 motion, Plaintiff's § 1983 excessive force claim against Goecker for the three punches Goecker is alleged to have made against Plaintiff would survive a motion for summary judgment." *Id.* at *3.)

11

Relying on Albrecht's and Paris' accounts, Defendants say that the case at hand is like *Robinette*, *Matthews*, and *Wylie*. Specifically, the Plymouth Defendants assert that Powell "repeatedly rebuffed" the officers' commands, acted in a manner "much more violent than either the *Robinette* or *Matthews* plaintiffs," and "vigorously fought the Defendants." (Albrecht's Mot. Summ. J. at 7.) The Westland Defendants, relying on *Wylie*, provide that Powell "refused to put his hands behind his back and . . . was kicking back at the officers" and that, even after Radar's bites, "Plaintiff attempted some resistance." (Westland Defs.' Mot. Summ. J. at 8.)

But the Court cannot accept these assertions when Powell swears to something different and the circumstances of the arrest, unlike in the above-referenced cases, are not fully supportive of the Defendants' version. Powell says that when he reached a large fence, "Paris ordered [him] to get on the ground," and he "complied" by "getting on the ground face down on his stomach" and by "plac[ing] his hands behind his back." (Am. Compl. at 5.) Powell continues: "[I] was handcuffed moments later. Other Officers *began* to arrive and began to stomp [me] in the head, face, and stomach as well as several punches thrown at [me]. *Within a few minutes*, an Officer brought a dog up to [me], caused the dog to attack." (*Id.* (emphases added).) A reasonable jury hearing this testimony could infer that (1) although Powell had attempted to flee, when he was faced with a six-foot fence on one side and officers closing in on the other, he recognized the futility of escape and decided to comply with the officers' order to surrender; (2) Powell then made this decision known to the officers by lying down on his stomach while keeping his hands behind his back within the officers' view; (3) the officers then handcuffed him; and (4), after all of that, the officers, perhaps out of frustration or to punish, struck Powell and ordered Radar to bite him.

12

Based on this narrative, this case is not like any summarized above. In *Robinette* an unsecured suspect was hidden in a dark building, refused to show himself, and could potentially ambush the officer. Similarly, in *Matthews* the unsecured suspect was hidden in a wooded area where he could ambush the officers, was lying face down with hands concealed underneath his stomach, and made a sudden movement after being told not to move. In *Wylie*, the suspect's shirt was still being held by the officer when the suspect turned and raised his hands, reasonably suggesting to the officer that the suspect was initiating an assault; here, Powell was handcuffed and lying face down when officers allegedly attacked him. Finally, in *Phipps*, the court found relevant that the unsecured suspect was lying down in nearly a foot of snow, with his hands concealed under himself, and made no indication that he was surrendering even when he knew officers were present; in contrast, Powell demonstrated his surrender by lying down on the ground with his hands behind his back and was then handcuffed before Radar engaged. In short, none of Defendants' cases, nor *Phipps*, is analogous to Powell's version of the facts.

Rather, in viewing the "totality of the circumstances," *Fox*, 489 F.3d at 236, as Powell states them, a jury could find that the officers' conduct was objectively unreasonable. The facts leading up to the arrest arguably support the officers' use of force. The officers, some of them at least, knew that Powell had broken into the market. The officers could have also reasonably believed that Powell was armed. It was still dark out, and Powell fled from the first responding officer and then hid in bushes. Later, Powell failed to heed Albrecht's warning to stop running on penalty of Radar's release. But under Powell's narrative, and reasonable inferences drawn from it, the events took a sharp turn. *See Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607-08 (6th Cir. 2006) ("[T]hat Baker had attempted to evade arrest does not preclude his claim of excessive force against Officer

13

Taylor or render Officer Taylor's use of his asp reasonable."); *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996) ("[I]n reviewing the plaintiffs' excessive force claim, we limit the scope of our inquiry to the moments preceding the shooting."). As discussed, Powell says that when he reached the large privacy fence, he gave up by lying down with his hands behind his back, he was then cuffed, and, not until after that, did the use of force begin. Taking this narrative as true, a reasonable jury could find that the officers' use of force was excessive. *See McAdam v. Warmuskerken*, No. 12-2330, 2013 WL 1092729, at *2 (6th Cir. Mar. 15, 2013) ("[M]ay an officer tase an individual who is subdued on the ground and is not resisting arrest, even if the officer does so only once? No."); *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011) ("[O]ur prior opinions clearly establish that it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented.").

But which "officers"? The Court has repeatedly used this vague term because Powell uses it: aside from Paris and Albrecht, he says that "Named Defendants" and "Other Officers" participated in the alleged punching and stomping or watched it happen. (Am. Compl. at 5.) Paris' report provides a little clarification: it says that Brassfield helped arrest Powell. (Paris' Rep. at 6; *see also* Albrecht's Rep. at 3 (indicating the presence of two Westland officers in addition to Albrecht and Radar at the time of arrest).) Accordingly, a reasonable jury could find that Albrecht, Brassfield, and Paris violated Powell's Fourth Amendment rights. This is enough for the Court to turn to the "clearly established" inquiry as to those Defendants.

14

**B.**

Defendants claim that even if they violated Powell's Fourth Amendment rights, they are not subject to suit because they are entitled to qualified immunity. Qualified immunity shields state officials from suits based on their reasonable discretionary acts. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Moldowan v. City of Warren*, 578 F.3d 351, 396 (6th Cir. 2009). In deciding whether an official is entitled to qualified immunity, a court asks two questions, in any order: (1) whether the plaintiff has shown that the official violated his constitutional rights, and (2) whether those rights were "clearly established" at the time the official acted. *Pearson*, 555 U.S. at 232, 236. Here, the Court has already concluded that there is a genuine dispute over facts material to whether Albrecht, Brassfield, and Paris violated Powell's Fourth Amendment rights.

As for the "clearly established" prong, precedent emphasizes that the right at issue must be carefully framed. Thus, "a lofty definition of the right ('the right to be free from excessive force,' . . .), one floor down from the words of the Fourth Amendment itself ('the right to be free of "unreasonable . . . seizures"') and two floors down from the highest level of generality possible ('the right to be free from a constitutional violation')" is improper. *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508-09 (6th Cir. 2012). Instead, a court must "go down the stairs of abstraction to a concrete, particularized description of the right." *Id.* But "not too far down: just as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)." *Id.* at 509; *accord Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013).

15

The task, therefore, "is not to match each application of force with a precisely analogous case to demonstrate its prohibition." *Martin*, 712 F.3d at 960-61. Instead, "[a]n action's unlawfulness may be plain 'from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs.'" *Id.* (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir.2004)). "So while the contours of a right must be sufficiently clear a fundamentally similar or materially similar case is not required to show it is clearly established." *Id.* (internal quotation marks and citations omitted).

At a reasonable level of generality, the question in this case is whether it was clearly established in December 2011 that striking a suspect, or ordering a police dog to repeatedly bite a suspect, after the suspect had complied with orders by lying face down on the ground with his hands behind his back, and after the suspect had been handcuffed, constitutes excessive force. The controlling case law says it was: *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) ("The general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued . . . or is not resisting arrest."); *Griffith v. Coburn*, 473 F.3d 650, 659-60 (6th Cir.2007) ("[I]t is clear that [the suspect] posed no threat to the officers or anyone else. It follows that the use of the neck restraint in such circumstances violates a clearly established constitutional right to be free from gratuitous violence during arrest and is obviously inconsistent with a general prohibition on excessive force."); *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."); *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893,

16

902-03 (6th Cir. 2004) ("[I]t is clearly established that the Officers' use of pepper spray against Champion after he was handcuffed and hobbled was excessive."); *Phelps v. Coy*, 286 F.3d 295, 301-02 (6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was."); and *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994) ("A reasonable person would know that spraying mace on a blinded and incapacitated person sitting in a car would violate the right to be free from excessive force.").

In brief, the "dispositive question is whether the defendants had fair warning that their actions were unconstitutional." *Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) (internal quotation marks omitted). The Court believes that the listed authorities, all from this Circuit, all published in the reporters, and all well before December 2011, gave Westland and Plymouth Township police officers adequate notice that striking or ordering a dog to bite a suspect, after the suspect complies with orders and is secured by handcuffs, was prohibited by the Fourth Amendment. It follows that, on this record at least, none of Paris, Brassfield, or Albrecht is entitled to qualified immunity.

## C.

The situation with Defendants Ewing, Fruit, Sleep, Farrar, Skeans, Darga, "Unknown K-9 Police Officer (Dog)," Plymouth Township, and the City of Westland is different. The Westland Defendants' brief focuses on the fact that Powell was a threat to the "officers" and resisted their attempts to arrest him; apparently for this reason, the brief does not distinguish Paris and Brassfield's conduct from that of the other Westland officers. (Westland Defs.' Mot. Summ. J. at 8; *see also id.* at 13 ("The Westland officers who were present at the seizure and arrest of the

17

Plaintiff are clearly entitled to qualified immunity under the facts of this case.").) As for the Plymouth Defendants, they improperly seek summary judgment in favor of the Township for the first time in their reply brief. *See* (Albrecht's Mot. Summ. J.; Dkt. 32, Albrecht's Reply at 3-4); *State Farm Fire & Cas. v. Whirlpool Corp.*, No. 3:10-1922, 2012 WL 2422922, at *2 (N.D. Tex. June 27, 2012); *Riggs v. City of Owensville*, No. 4:10-793, 2011 WL 1743691, at *8 (E.D. Mo. May 4, 2011). Thus, Ewing, Fruit, Sleep, Farrar, Skeans, Darga, "Unknown K-9 Police Officer (Dog)," Plymouth Township, and the City of Westland have not properly discharged their summary judgment burden.

The Court, however, has reviewed the Amended Complaint and believes that it fails to state a claim against these nine Defendants. Although courts typically cannot *sua sponte* dismiss insufficiently pled claims, because Powell is proceeding *in forma pauperis*, 28 U.S.C. § 1915(e)(2) applies here. *See Moniz v. Hines*, 92 F. App'x 208, 210 (6th Cir. 2004). That statute requires a court to dismiss a cause of action "at any time" that the court determines that it "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). Federal Rule of Civil Procedure 12(b)(6) standards govern dismissal for failure to state a claim under § 1915(e)(2)(B)(ii). *Hill v. Lapin*, 630 F.3d 468, 470-71 (6th Cir. 2010). Thus, under § 1915(e)(2)(B)(ii), a court must dismiss a claim that lacks factual content that would allow a court to reasonably infer that the defendants are liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

The Amended Complaint does not contain sufficient factual allegations regarding the conduct of Defendants Ewing, Fruit, Sleep, Farrar, Skeans, or Darga. Powell says that after he was handcuffed, "Other Officers" arrived and punched and stomped him. (Am. Compl. at 5.) He also says that "Named Defendants" failed to protect him from the harm inflicted by "other police

18

officers." (*Id.*) The Sixth Circuit says that these types of allegations, lumping defendants together, do not satisfy *Iqbal*'s pleading requirements. *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (finding that complaint failed to state a *Bivens* claim against two federal agents because it referred to all defendants categorically and did not identify the personal involvement of the agents); *accord Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("Given the complaint's use of either the collective term 'Defendants,' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional act they are alleged to have committed."); *Miller v. City of Detroit*, No. 12-10186, 2013 WL 2446129, at *3 (E.D. Mich. June 5, 2013) ("The complaint in the present case suffers from the identical infirmity as did the complaint in *Marcilis*. In both cases, the complaint consists almost entirely of generalized allegations against 'defendants' collectively, as opposed to specific allegations as to 'what each defendant did to violate the asserted constitutional right.'"); *see also Iqbal*, 556 U.S. at 677 ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

As to the two municipal defendants, Powell asserts that "Westland and Plymouth Townships [are liable] for inadequate training or supervision of police, that directly caused 'deliberate indifference' or 'gross negligence' causing an unusually excessive use of force," and that he "intends to establish that a policy or custom of the municipality caused the injury by failing to train and discipline officers or adequately investigate the incident." (Am. Compl. at 6.) But these statements are merely legal conclusions that the Court does not accept as true. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere

19

conclusory statements, do not suffice."). Further, both failure-to-train and failure-to-supervise claims require Powell to prove, among other things, that the municipalities were deliberate indifferent. *Marcilis*, 693 F.3d at 605. In turn, deliberate indifference requires Powell to "show prior instances of unconstitutional conduct demonstrating that the [municipalities] ha[ve] ignored a history of abuse and [were] clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008). Alternatively, "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Id.* Powell's Amended Complaint lacks allegations regarding either the municipalities' training of their officers to "handle recurring situations presenting an obvious potential for" excessive force or the municipalities' indifference to prior instances of unconstitutional force. Accordingly, Plymouth Township and the City of Westland should be dismissed.

Finally, as for "Unknown K-9 Police Officer (Dog)," i.e., Radar, the Court appreciates that Radar injured Powell. But Radar is not a "person" and the police dog must be dismissed for that reason. *See Hicks v. City of Barberton*, No. 11-76, 2011 WL 3022089, at *3 (N.D. Ohio July 22, 2011) ("Hicks cannot bring a civil rights action against the police dog.").

## IV.

In short, this case presents the not uncommon situation where Defendants say one thing happened, and under their account, the force they used might have been reasonable; but Plaintiff says something different occurred, and under his version of the facts, a reasonable jury could find that the officers used force prohibited by the Fourth Amendment. Accordingly, the Court

20

RECOMMENDS that "Defendant, Officer Steve Albrecht's Motion to Dismiss And/Or in the Alternative, Motion for Summary Judgment" (Dkt. 25) and "Defendants City of Westland, Sgt. Ewing, Officer Fruit, Officer Sleep, Officer Farrar, Officer Skeans, Officer Darga, Officer Brassfield and Officer Paris' Motion for Summary Judgment" (Dkt. 26) be DENIED. But because Plaintiff's Amended Complaint (Dkt. 13) fails to state a cognizable claim against Ewing, Fruit, Sleep, Farrar, Skeans, Darga, "Unknown K-9 Police Officer (Dog)," Plymouth Township, and Westland Township (City of Westland), and because Plaintiff proceeds *in forma pauperis* in this case (Dkt. 6), these nine Defendants should be DISMISSED pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Finally, although Defendants Albrecht, Brassfield, and Paris should remain in this case in their personal capacities, Powell's official capacity claims are barred by sovereign immunity and should be DISMISSED. *See S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (explaining that suits against state officials in their official capacity are effectively suits against the state, and therefore barred by sovereign immunity insofar as the suit seeks monetary damages and not prospective, injunctive relief).

## V.

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  June 18, 2013


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 18, 2013.


s/Jane Johnson
Deputy Clerk

22